1
2
3
4
5
6
7

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

JOSEPH A SMITH,

          Plaintiff,

   v.

EQUINOX HOLDINGS, INC., et al.,

          Defendants.

Case No.  14-cv-00846-LB

**ORDER ON SUMMARY JUDGMENT**

[Re: ECF No. 49]

## INTRODUCTION

Plaintiff Joseph Smith sued his former employer Equinox for unpaid wages under California law based on Equinox's allegedly mistaken classification of him as an exempt employee. (Compl., ECF No. 1-1.)[1] He also sued for (1) retaliatory termination, (2) defamation based on an Equinox manager's allegedly telling other employees that Equinox fired him for "integrity" reasons, and (3) breach of contract. (*Id.*) Equinox counters that Smith was an exempt employee and thus is not entitled to additional wages and that it fired him for violation company policy. (Motion, ECF No. 49.) It moves for summary judgment on all claims. (*Id.*)

Because genuine issues of material fact preclude summary judgment, the court denies Equinox's summary-judgment motion.

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the tops of the documents.

**STATEMENT**

This case is about a retail manager who performed well for years, but who was eventually fired when his employer discovered that he had (allegedly) breached company policy in certain transactions. Many facts are undisputed. The court recounts them here from the parties' joint statement of undisputed material facts (ECF No. 49-1). The Analysis below contains a more detailed discussion of additional facts relevant to specific issues.

# I.  SMITH'S EMPLOYMENT HISTORY WITH EQUINOX

From 2008 to December 2013, Plaintiff Joseph A. Smith worked as a manager for several Equinox retail clothing and workout-gear shops located in Equinox Fitness facilities in California. (ECF No. 49-1, ¶ 1.) Mr. Smith started working for Equinox in the summer of 2008 as a Regional Shop Manager. (*Id.* ¶ 2.) His offer letter states that his employment would be at will. (*Id.* ¶ 3.) A year or two later, Mr. Smith's title was changed to District Shop Manager. (*Id.* ¶ 4.) He later became the National Shop Training Manager. (*Id.* ¶ 5.) During his career, Mr. Smith was responsible for three Equinox shops in California. (*Id.* ¶ 6.)

## A.  Plaintiff's Job: Duties and Characteristics

Mr. Smith was responsible for training and developing both sales associates and Managers on Duty. (*Id.* ¶¶ 6, 17.) His salary when he was fired was roughly $61,000 per year. (*Id.* ¶ 7.) (Equinox sales associates made around $10 per hour. (*Id.* ¶ 8.)) He participated in the hiring of approximately 15 associates. (*Id.* ¶ 9.) He claims that "on a daily basis" he researched the previous day's sales to decide how to place items on the floor. (*Id.* ¶ 28.) He was responsible for ensuring that all three shops had systems that mirrored one another according to corporate directives. (*Id.* ¶ 29.) Mr. Smith could choose (and submit for upper-management approval) which stores he would visit on which days. (*Id.* ¶ 30.) He made hiring recommendations that were followed "more often than not" and promoted one sales associate to Manager on Duty. (*Id.* ¶ 30.) His 2009 performance review reflects that he oversaw "trunk shows" and special events at the shops, and was responsible for ensuring that club events were "cleanly" executed. (*Id.*) It is undisputed that, as District Shop Manager, Mr. Smith engaged in and was responsible for:

- *Talent management* — Helping with and ensuring the proper coaching, training, and development of sales associates and Managers on Duty; identifying "top trainers."

- *Operational excellence* — Understanding and upholding loss-prevention and inventory-management policy, including ensuring that the team followed the policies; ensuring that he and his team understood all communication and training materials and accurately completed assigned operational tasks; helping with scheduling and shift coverage; administering and completing "Shop Visit Audits."

- *Product and presentation* — Ensuring that the shop and staff reflected brand standards (proper execution of merchandising, "marketing direction," and dress code); enforcing and maintaining organizational standards on sales floor, at "cash wraps," and in stockrooms; ensuring that shops within his territory were visually enticing.

- *Professional dimensions* — Building effective relationships with employees, colleagues, supervisors, and clients; maintaining working knowledge of happenings and general standards and practices outside the shop; complying with and enforcing company policy and procedure; resolving personnel concerns fairly and in a timely manner.

(*Id.* ¶ 32.)

Mr. Smith was deployed to train and develop talent in the company; he focused on finding the best possible staff and on "bringing them to a level that would make his shops operate flawlessly." (*Id.* ¶¶ 10-16.) In his 2012 review, he highlighted the fact that he had promoted a sales associate to Manager on Duty in Palo Alto and had also cultivated new talent for a new Manager on Duty at the Pine Street store. (*Id.* ¶ 12.) As manager, Mr. Smith was responsible for ensuring that sales associates did their jobs and correcting them to improve performance. (*Id.* ¶¶ 19-20.) He completed performance reviews for his associates. (*Id.* ¶ 18.)

Mr. Smith was further expected to understand, train other employees on, and enforce company policy. (*Id.* ¶¶ 22-23, 32.) This included the meal-break policy. (*Id.*) When Mr. Smith was in the shops himself, he enforced those policies; he gave permission for breaks and reminded people to take breaks when they were due. (*Id.* ¶¶ 22-23.)

Mr. Smith also performed work that Equinox characterizes as being "much above the District Shop Manager title." (*See* ECF No. 49 at 11.) However characterized, it is undisputed that Mr. Smith helped open new stores in Southern California, in the course of which he trained new associates and managers. (ECF No. 49-1, ¶ 24.) He trained three new district managers in 2011 and led the "LA 2 District" in Los Angeles. (*Id.* ¶¶ 25.) The previous year, Equinox had sent Mr.

Smith to Florida to help turn around the region, which had been performing poorly, by training a new manager and identifying opportunities for that manager to produce better results for Equinox. (*Id.* ¶ 26.) In 2013, Equinox flew him to New York to work with the Senior Manager of Retail Operations, Becca Briggs, to revise training documents in advance of a national meeting. (*Id.* ¶ 33.)

Mr. Smith's employment agreement with Equinox established certain sales goals for the shops that he managed. Sometime in Spring or Summer 2013, Equinox raised those goals. (*Id.* ¶ 35.) Mr. Smith knows of no policy forbidding the company from raising his sales goals (*Id.* ¶ 36.) He does not know the criteria that Equinox uses when deciding whether to raise goals. (*Id.*) His regional manager, Brooke English, told him that his sales goals had been raised because he was doing "fabulous" work and the company believed that he could meet the more ambitious targets. (*Id.* ¶ 37.)

### B.  Mr. Smith Complains to Equinox

Early in 2013, Mr. Smith allegedly raised concerns to senior Equinox personnel that non-exempt shop employees were not able to take their breaks on time and that the company was not complying with its meal- and rest-break policy. (*Id.* ¶ 41.) Mr. Smith does not recall anyone at Equinox telling him that he should not complain about these things. (*Id.* ¶¶ 43-44.) He further alleges that shortly before June or July 2013 he complained to several Equinox officers that he himself was misclassified as exempt. (*Id.* ¶ 47.) He was aware that a wage-and-hour class action had been filed against Equinox. (*Id.* ¶ 40; Smith Dep. – ECF No. 49-3 at 74.)

### C.  Underperformance, Investigation, Termination

In November 2013, Equinox noticed low profit margins in its Northern California stores. (ECF No. 49-1, ¶ 48.) The ensuing investigation revealed low margins in Mr. Smith's shops and associated these low margins with sales prices being applied after sales had ended. (*Id.* ¶ 49.) Equinox then started to investigate Mr. Smith. (*Id.* ¶ 50.) On November 7, 2013, Equinox personnel met with Mr. Smith and other shop employees. (*Id.* ¶ 51.) Equinox told Mr. Smith that he could prepare a written response to the issues raised at the meeting and that this "would be

United States District Court
Northern District of California

passed along to people who better understand shop business." (*Id.* ¶ 52.) Mr. Smith felt uncomfortable with this approach; he declined to submit a written response and instead asked "to speak with someone else at Equinox regarding the matter." (*Id.*)

Equinox concluded that Mr. Smith had rung his own sale and given himself a discount on items that should not have been discounted. (*Id.* ¶ 56.) It is undisputed that Equinox's loss-prevention provided that anyone found applying unauthorized discounts to transactions could be subject to discipline up to and including termination. (*Id.* ¶¶ 53, 55.) Mr. Smith understood this. (*Id.*) His position as a regional and district manager obligated him not only to follow loss-prevention policies himself but to ensure that shop associates followed them as well. (*Id.* ¶ 54.) Tracey Gaven-Bridgmann, the Equinox manager who fired Mr. Smith, participated in the firing of an employee who "she believes to have been a Manager on Duty" in one of the company's New York stores "for abusing the employee discount and ringing her own sales." (*Id.* ¶¶ 56-57.) The New York employee was actually fired for misusing a customer's gift card. (Briggs Dep. – ECF No. 51-3 at 175.)

In December 2013, Equinox fired Mr. Smith for ringing up his own sales and giving unauthorized discounts. (*Id.* ¶¶ 56, 60, 61.) The Equinox officer who fired Mr. Smith testified that, when she made that decision, he had not given any explanation for his challenged actions. (*Id.* ¶ 54.) Mr. Smith has testified that two other Equinox store managers told him that "they heard he was terminated for 'integrity reasons.'" (*Id.* ¶ 64.) One of these managers also told him that she had been told this by regional manager Brooke English. (*Id.* ¶ 65.) Mr. Smith did not know of anything suggesting that information about his firing had been otherwise "made public." (*Id.* ¶ 67.)

## II. DISPUTED FACTS

Both parties go beyond the undisputed facts to offer additional details about the composition of Mr. Smith's work. These details will affect the pivotal question of whether Mr. Smith was "primarily engaged" in exempt managerial work. Mr. Smith argues that, whatever his managerial duties, he spent most of his time doing non-exempt work. Equinox denies this.

1    For its part, to the undisputed facts recounted above, Equinox adds a single item: It contends

2    that Mr. Smith's "register history" at Equinox shows that, during his whole tenure, he rang up

3    "approximately 3% of the sales in his shops." (ECF No. 49 at 12; Briggs Decl. – ECF No. 49-5 at

4    1, ¶ 2.) This proves (in Equinox's view) that Mr. Smith "rarely acted as a [non-exempt] sales

5    associate." (ECF No. 49 at 12.)  It explains: "[T]he percentage to total sales contribution of any

6    associate working in any of Equinox'[s] shops is almost exactly the percentage of the total

7    operating hours that they work." (*Id.* (citing Briggs Decl. – ECF No. 49-5 at 2, ¶ 3).) A sales

8    associate who works 60% of the hours in a given shop will ring up 60% of sales; one who works

9    10% of the hours will account for that fraction of sales.

10    The plaintiff goes further in filling out the record. His basic assertion is that he "performed

11    non-managerial duties for more than 50% of his work time." (ECF No. 51 at 10.) He claims that

12    he "spent most of his work time receiving shipments, stocking shelves, folding merchandise, and

13    selling clothing." (*Id.* (citing Smith Dep. – ECF No. 51-2 at 16).) "These were the same job duties

14    performed by non-exempt Shop employees." (ECF No. 51 at 10 (citing Smith Dep. – ECF No. 51-

15    2 at 22-23, Smith Decl. – ECF No. 51-5 at 2, ¶ 5).) "During an average work week," Mr. Smith

16    continues, he "spent approximately 30-40% of his work time receiving deliveries of merchandise,

17    unpacking this merchandise, processing the merchandise in preparation for putting it on Shop

18    shelves, logging this merchandise in the Equinox database system, tagging this merchandise, and

19    disposing of the boxes and packing materials" in which it arrived. (ECF No. 51 at 10 (citing Smith

20    Decl. – ECF No. 51-5 at 2, ¶ 6 and Gaven-Bridgmann Dep. – ECF No. 49-3 at 112-13 ).) Another

21    "40-50% of his work time" Mr. Smith describes as occupied by "greeting customers . . . [,]

22    informing them of promotions . . . , organizing the . . . Shop floor," folding and displaying

23    merchandise, "creating sales tags, dressing mannequins, and cleaning the Shop floor." (ECF No.

24    51 at 10-11; Smith Decl. – ECF No. 51-5 at 2, ¶ 6.) He also rang up customer sales. (*Id.*) Finally in

25    this vein, Mr. Smith asserts that he spent "approximately 5-10% of his work time checking

26    inventory in the backroom, organizing the backroom, and cleaning the backroom." (*Id.*)

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1     On a related point, Mr. Smith claims that, "[a]lthough he was a District Manager," he "had

2 minimal authority and discretion over his work because his supervisors and Equinox's corporate

3 office had to approve most of his decisions." (ECF No. 51 at 11.) According to Mr. Smith, the

4 corporate office instructed him on "how to manage the Shops, select merchandise, manage

5 inventory, ensure loss prevention, and carry out company brand standards." (*Id.*) "Equinox's

6 corporate office controlled the operation of the Shops," he continues, "including developing key

7 business metrics, selling tactics, and how to clean and maintain the Shop." (*Id.*) He "had no input

8 into the budget" for the shops that he managed, and "did not have authority to determine the labor

9 hours that were allocated" to his shops. (*Id.*)

10                                         *   *   *

11     Having set out these additional facts, this may be the best place to address the parties' crossing

12 objections about this material. The plaintiff objects to parts of Ms. Briggs's testimony —

13 especially her assertion that Equinox "register history" for Mr. Smith shows that he accounted for

14 roughly 3% of sales in his shops.[2]

15     Then there is the defendant's objection. Equinox complains that Mr. Smith's opposition

16 invokes a "raft of facts" without having conferred with Equinox's counsel about whether any of

17 them would have been "appropriate for a joint statement of facts." (ECF No. 52 at 6.) This

18 "violate[s] the spirit" of the court's standing order, which contemplates that a party opposing

19 summary judgment "may propose additional undisputed facts to the moving party . . . and ask for

20 a response . . . ." (*Id.* (quoting standing order)). Equinox argues that "all" such evidence should be

21 struck or — what amounts to the same thing — "should be given no weight whatsoever." (*Id.*)

22     The court disagrees. The plaintiff is simply pointing to additional facts that it deems material

23 to the summary-judgment analysis. If those facts are disputed, the plaintiff must think that he can

24

---

25   [2] Mr. Smith challenges this evidence, arguing that the basis for this figure was not supported by
   the actual register history. (ECF No. 51 at 16.) Equinox then submitted a supplemental declaration
26   with its reply brief with more evidentiary support. (ECF No. 52.) Mr. Smith responded that the
   court should not consider this further evidence, in part because it was untimely. (ECF No. 53.) The
27   court need not resolve this issue because, even considering the supplemental evidence, and as
   discussed below, genuine issues of material fact about Mr. Smith's work duties preclude summary
28   judgment.

ORDER 14-846 LB

prove them to a trier of fact, and that they will consequentially (read: materially) impact the Rule 56 inquiry. Nothing in Rule 56 confines a summary-judgment opponent to arguing from only undisputed facts. Nothing in Rule 56 obligates a party to concede that the only *material* facts in a case are those on which the parties agree. Summary judgment poses exactly the question: *Are there* disputed material facts? If there are not, then, in most conceivable cases, one party should be entitled to summary judgment. But summary judgment may be inappropriate precisely because there are *disputed* facts that impact the analysis and help delimit the permissible conclusions.

Perhaps the better practice would have been to meet and confer over — and, if possible, agree on — additional undisputed facts. That is what the court's standing order contemplates. (And, of course, the court expects parties to follow its standing order.) But that same standing order also provides: "Joint statements of undisputed facts are *not required* but are helpful." (Standing Order at 4, ¶ 8 (emphasis added).) This reflects a practical reality that obtains here: Even if the parties had conferred, that could not have guaranteed that they would agree to further undisputed facts. And, again, nothing in summary-judgment law prevents the plaintiff from propounding other facts as disputed and material.

## ANALYSIS

### I. MISCLASSIFICATION

Most of the plaintiff's claims stem from his charge that Equinox wrongly classified him as an exempt employee under California labor laws, and so denied him the various benefits (such as overtime pay and paid meal periods) that he would have been entitled to had he been classified as non-exempt. Mr. Smith's first six claims depend directly on this root allegation that he was misclassified; his seventh claim, under California's UCL, likewise depends on the contention that Equinox wrongly treated him as an exempt employee.

Equinox argues that Mr. Smith was indeed exempt and, on this ground, seeks summary judgment against Claims 1-7. Specifically, Equinox claims that Mr. Smith fell under the "executive exemption." (*E.g.,* ECF No. 49 at 16.) "[T]he assertion of an exemption . . . is considered to be an affirmative defense, and therefore the employer bears the burden of proving

the employee's exemption." *Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal.4th 319, 338 (2004) (quoting *Ramirez v. Yosemite Water Co.*, 20 Cal.4th 785, 794-95 (1999)). Proving the exemption is a complete defense to, and warrants summary judgment against, claims of misclassification. *In re United Parcel Serv. Wage and Hour Cases*, 190 Cal. App. 4th 1001, (2010) ("*UPS*") (citing authorities) ("A moving defendant may properly meet its burden on summary judgment by conclusively establishing a defense to the [misclassification] claim."); *see Hill v. R+L Carriers, Inc.*, 690 F. Supp. 2d 1001, 1005 (N.D. Cal. 2010).

### A.  Governing Law

To show that Smith was exempt, Equinox is "required to demonstrate the following: (1) his duties and responsibilities involve management of the enterprise or a 'customarily recognized department or subdivision thereof'; (2) he customarily and regularly directs the work of two or more employees; (3) he has the authority to hire or terminate employees, or his suggestions as to hiring, firing, promotion or other changes in status are given 'particular weight'; (4) he customarily and regularly exercises discretion and independent judgment; (5) he is primarily engaged in duties that meet the test of the exemption; and (6) his monthly salary is equivalent to no less than two times the state minimum wage for full-time employment." *UPS*, 190 Cal. App. 4th at 1014 (citing Cal. Code Regs., tit. 8, § 11090, subd. 1(A)(1)). "Because the exemption uses conjunctive language," Equinox is "required to establish *all* of the elements." *UPS*, 190 Cal. App. 4th at 1014 (emphasis in original) (citing, *inter alia*, *Eicher v. Advanced Bus. Integrators, Inc.*, 151 Cal. App. 4th 1363, 1372 (2007)).

"Determining whether or not all of the elements of the exemption have been established is a fact-intensive inquiry." *UPS*, 190 Cal. App. 4th at 1014. "The appropriateness of any employee's classification as exempt must be based on a review of the actual job duties performed by that employee." *Id.* at 1015. "The *work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work,* together with the employer's realistic expectations and the realistic requirements of the job, shall be considered . . . ." *Id.* (emphasis in *UPS*) (citing Cal. Code Regs., tit. 8, § 11090, subd.

1   1(A)(1)(e) and *Ramirez*, 20 Cal.4th at 802). The court must, in other words,

2

3      inquir[e] into the *realistic* requirements of the job. In so doing, the
       court should consider, first and foremost, how the employee actually

4      spends his or her time. But the trial court should also consider
       whether the employee's practice diverges from the employer's

5      realistic expectations, whether there was any concrete expression of
       employer displeasure over an employee's substandard performance,

6      and whether these expressions were themselves realistic given the
       actual overall requirements of the job.

7   *Ramirez*, 20 Cal.4th at 802 (emphasis in original).

8       This has all been broadly viewed as involving a "two-step inquiry." *Vinole v. Countrywide*

9   *Home Loans, Inc.*, 571 F.3d 935, 945 (9th Cir. 2009); *see also, e.g., Campbell v.*

10  *PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 600 (E.D. Cal. 2008). First, the court examines in

11  an individualized fashion the work by the employee to determine how much of that work is

12  exempt. *Vinole*, 571 F.3d at 945. Second, the court determines whether the employee's work was

13  consistent with the employer's expectation and whether those expectations were realistic. *Id*

14  (footnote omitted); *accord Sepulveda v. Wal–Mart Stores, Inc.,* 237 F.R.D. 229, 246 (C.D. Cal.

15  2006), *aff'd in relevant part,* 275 Fed. Appx. 672 (9th Cir. 2008).

16  **B.  Application: Fact Issues Preclude Summary Judgment**

17      The court finds that there is no material dispute on four of the six executive-exemption

18  elements described in *UPS, supra*. Specifically — and following the *UPS* numbering scheme for

19  these elements — Equinox has shown that Mr. Smith: 1) managed a "customarily recognized

20  department or subdivision" of Equinox; 2) customarily and regularly directed the work of two or

21  more employees; 3) had authority to hire or fire employees, or that his suggestions on such matters

22  were given "particular weight"; and 6) made more than twice California's minimum wage (a point

23  that is effectively undisputed (*see* ECF No. 49-1, ¶¶ 7-8) and so is not discussed further here).

24      Material factual disputes exist, however, on whether Mr. Smith: 4) customarily and regularly

25  exercises discretion and independent judgment; and 5) was "primarily engaged" in exempt work.

26  Because Equinox has the burden to prove all the *UPS* elements, the material factual disputes on

27  these items preclude summary judgment against the six claims directly rooted in alleged

28

United States District Court
Northern District of California

ORDER 14-846 LB

1   misclassification, and the seventh, derivative claim under the UCL. Furthermore, the court finds

2   that a material factual dispute exists over whether it was realistic for Equinox to expect that Mr.

3   Smith would spend most of his time in exempt activities.

### 1.   Customarily Recognized Department Or Subdivision

5   "There is a dearth of case law interpreting the rather simple phrase 'customarily recognized

6   department or subdivision thereof.'" *UPS*, 190 Cal. App. 4th at 1016. "The federal regulation

7   expressly incorporated into [California's] Wage Order 9 defines the phrase 'customarily

8   recognized department or subdivision' as distinguishing 'between a mere collection of men

9   assigned from time to time to a specific job or series of jobs and *a unit with permanent status and*

10  *function.*'" *UPS*, 190 Cal. App. 4th at 1016 (citing 29 C.F.R. § 541.104(a) (emphasis in *UPS*)).

11  The plaintiff offers no legal argument to support his contention that material facts remain in

12  dispute on this point. He argues that Equinox's centralized control was so "stringent" as to render

13  each Equinox retail shop a "mere cog" and thus "unrecognizable" as a department or subdivision

14  of Equinox. But, again, he offers no legal authority to support this conclusion. And, as both parties

15  describe the rudimentary facts of this case, the court finds untenable the contention that brick-and-

16  mortar retail shops, with fixed personnel daily carrying out routinized duties, does not constitute a

17  "customarily recognized department or subdivision" of Equinox. The court holds that the Equinox

18  shops, as they have been described in this case, are "customarily recognized department[s] or

19  subdivision[s]" of Equinox.

### 2.   Managing two or more employees

21  The court finds it equally untenable for Mr. Smith to contend that he did not customarily direct

22  the work of two or more employees. The undisputed facts, and the additional facts that Mr. Smith

23  himself has asserted, show that he had various managerial duties for three Equinox shops. As

24  Equinox rightly points out, Mr. Smith has himself said that there was typically one sales associate

25  or Manager on Duty working at any given time in each shop. This means that Mr. Smith was

26  regularly managing at least three employees.

27  Mr. Smith does not dispute this. He instead argues — again conflating this element with the

question of independent discretion — that Equinox's corporate offices so controlled the retail shops that he effectively "shared [management] duty" with the corporate office, or with Equinox officers Tracey Gaven-Bridgmann and Brooke English. (ECF No. 51 at 18.) He argues that "shared responsibility" for management "does not satisfy this prong" of the executive exemption. (*Id.* (citing 29 C.F.R. § 541.104(d)).

There are at least two flaws to this reasoning. First, the regulation that Mr. Smith cites addresses situations where employees are managed by one or more people; the hours of the managed employee cannot count in whole toward calculating the executive exemption for both managers. (The regulation gives an illustration: "Hours worked by an employee cannot be credited more than once for different executives. . . . However, a full-time employee who works four hours for one supervisor and four hours for a different supervisor, for example, can be credited as a half-time employee for both supervisors." 29 C.F.R. § 541.104(d).) Nothing in the regulation indicates that corporate *policies* can so control a business as to diminish the credit (so to speak) that a putatively exempt worker gets for managing multiple employees under this prong of the exemption. Nor does Mr. Smith point to any authority for so anthropomorphizing the "level of [corporate] control" for purposes of this element. Again, he seems mainly to be borrowing notions from the "independent discretion" element and hoping that these will also carry water under the "managing multiple employees" factor.

Second, as Equinox argues, the actual people that Mr. Smith identifies as "sharing responsibility" for managing the employees in his three shops — Tracey Gaven-Bridgmann and Brooke English — "were rarely in [Mr. Smith's] stores." (*See* ECF No. 52 at 10.) Ms. Gaven-Bridgmann was based in New York and visited Mr. Smith's stores once per quarter. (*See* ECF No. 52 at 10.) Ms. English was based on Los Angeles and testified that she visited Mr. Smith's stores on only a few occasions. (*Id.*) As for the "Managers on Duty" and "assistant managers" that Mr. Smith generically identifies as possibly ("and/or") sharing managerial responsibility (ECF No. 51 at 18), these are exactly the people that *Mr. Smith* was managing. He points to no facts suggesting that, instead of being under his direction, these unnamed inferior managers so shared

1    responsibility for directing other employees that they must affect the "managing multiple

2    employees" head in the way that Mr. Smith proposes.

3            ***3.   Hiring, firing, and promoting employees***

4        There is no genuine dispute that Mr. Smith had authority regarding hiring and firing

5    employees — at least to the extent that his recommendations on such matters were given

6    "particular weight." The parties' undisputed facts recount that Mr. Smith "made hiring

7    recommendations which were followed more than not." (ECF 49-1, ¶ 30.) He "participated in the

8    hiring of approximately 15 associates." (*Id.* ¶ 9.) He "promoted one sales associate to" Manager

9    on Duty. (*Id.*) And he was involved in the development of various employees. (*Id.* ¶¶ 10, 12, 15,

10   32.)

11       "In order to satisfy this element of the executive exemption, the managerial or supervisory

12   employee need not have final authority to hire or fire. It is sufficient if his or her '*suggestions and*

13   *recommendations* as to hiring or firing and as to advancement and promotion or any other change

14   of status of the employee who[m] he supervises will be *given particular weight.*'" *UPS* at 1021-22

15   (quoting in part 29 C.F.R. § 541.106 and Cal. Code  Regs., tit. 8, § 11090, subd. 1(A)(1)(c)

16   (emphasis in *UPS*)). There was no triable issue on this head in *UPS* where the employee was "part

17   of the process of promoting and discharging employees," where he had in fact fired employees,

18   and where part of his work was to "manage and develop" employees, including completing

19   "regular performance appraisals" and "assisting in achieving career development goals." *UPS*, 190

20   Cal. App. 4th at 1022. There is likewise no triable issue on this point in this case.

21           ***4.   Discretion and independent judgment***

22       Two major *UPS* elements do involve material factual disputes, however, and these prevent

23   summary judgment against Mr. Smith's misclassification-based and UCL claims. The first such

24   issue involves whether Mr. Smith customarily and regularly exercised discretion and independent

25   judgment. This indeed presents a nearly prototypical jury question. The court may accept the

26   relevant facts as both parties depict them and yet be unable to dispose of the question as a matter

27   of law.

28

United States District Court
Northern District of California

Guidance again comes from the decision in *UPS*. The California Court of Appeal there wrote:

> [T]he phrase "exercise of discretion and independent judgment" is defined as generally involving "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term . . . implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance."

*UPS* at 1024 (quoting 29 C.F.R. § 541.207(a)). "The requirement that discretion be exercised with respect to 'matters of significance' means the decision being made must be relevant to something consequential and not merely trivial." *UPS* at 1024 (quoting 29 C.F.R. § 541.207(d)).

Mr. Smith argues that, "[g]iven the level of control and supervision exercised by Equinox's corporate office," it remains an issue of fact whether he exercised such discretion and independent judgment. (ECF No. 51 at 17-18.) He has testified that Equinox "had to approve most of his decisions," and, perhaps more important, directed him on "how to manage the Shops, select merchandise, manage inventory, ensure loss prevention" and even "how to clean and maintain the Shop." (*Id.* at 11.) As might be expected, Equinox "develop[ed] key business metrics"; Mr. Smith explains that he "had no input into the budget" for his shops, and "did not have the authority to determine the labor hours that were allocated" to his shops. (*Id.*)

This calls to mind further, and the court thinks determinative, observations from *UPS*:

> Perhaps the most frequent cause of misapplication of the term 'discretion and independent judgment' is the failure to distinguish it from the use of skill in various respects. An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories, . . . is not exercising discretion and independent judgment . . . . This is true even if there is some leeway in reaching a conclusion, as when an acceptable standard includes a range or a tolerance above or below a specific standard.

*UPS* at 1026 (quoting 29 C.F.R. § 541.207(c)(1)). That said, a regulated workplace does not rule out independent judgment; and, under California law, does not itself debar a finding on summary judgment that an employee *did* exercise independent judgment. Again, *UPS*: "We conclude that where . . . employer policies and procedures simply *channel* the exercise of discretion and

United States District Court
Northern District of California

judgment, as opposed to *eliminating* it entirely or otherwise constraining it to a degree where any discretion is largely inconsequential, the executive exemption may still apply. . . . Our charge to construe exemptions narrowly is not a directive to render them nonexistent." *UPS* at 1026.

Given this law, and the facts as currently developed, the court cannot say as a matter of law that Mr. Smith did or did not regularly exercise discretion and independent judgment within the meaning of the executive exemption. That is a question for the trier of fact and it prevents summary judgment.

### 5. *"Primarily engaged" in exempt activity*

A genuine issue of material fact exists, as well, on the question whether Mr. Smith was "primarily engaged" in exempt work, or whether, whatever his managerial duties, he spent most of his time "actually performing" non-exempt work. This is the issue that looms largest in the parties' discussions. The court finds it insusceptible to summary resolution.

"Under California law, the phrase 'primarily engaged' means 'more than one-half of the employee's worktime' is spent performing duties that qualify as exempt." *UPS,* 190 Cal. App. 4th at 1018. As discussed above, Mr. Smith asserts that, whatever his managerial (exempt) duties, in practice he spent most of his time ("more than 50%") doing the same work that non-exempt sales associates did: "stocking shelves," for example, "folding merchandise," and ringing up customer sales. (*See* ECF No. 51 at 10.) Mr. Smith estimates that his managerial work ultimately absorbed "approximately 10% of his work time." (*Id.*)

Equinox has made a countervailing factual assertion: namely, that Mr. Smith's "register history" shows him accounting for only 3% of sales in his shops, and that this implies he cannot have been "primarily engaged" in non-exempt work. If it proves true, that would indeed be a striking fact. With or without it, though, Mr. Smith's own testimony raises a factual issue on this point that the court cannot decide as a matter of law. This is especially true given that the burden to prove each element of the exemption rests on Equinox. On this issue, too, the court cannot grant the requested summary judgment.

United States District Court
Northern District of California

### 6. *Realistic expectations*

Finally in this area, Equinox argues (in sum) that, if Mr. Smith engaged in as much non-exempt work as he claims, he has departed from the expectations of the job he was hired and paid for, and cannot thereby shunt himself into non-exempt status. (*See* ECF No. 49 at 19-20.) Equinox raises a valid point. The California Supreme Court has indicated the role that an employer's expectations play in this respect:

> the trial court should also consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job.

*Ramirez*, 20 Cal.4th at 802. The court finds a material factual dispute to exist on this question. Mr. Smith has testified that the Equinox facilities were physically small and lightly staffed. (*See* Smith Dep. – ECF No. 51-2 at 16; Briggs Dep. – ECF No. 51-3 at 5-6; English Dep. – ECF No. 51-3 at 47-48.) By his description, these simple facts made it unavoidable that a manager in Mr. Smith's position would be among the inventory and customers, and by force of circumstance would end up discharging many of the same tasks as non-exempt employees. It is further relevant in this vein that Mr. Smith describes spending, not just most, but the vast majority of his time in non-exempt work. The California Supreme Court in *Ramirez* wrote that, in determining "the *realistic* requirements of [a] job," the court "should consider, first and foremost, how the employee actually spends his or her time." *Id.* (emphasis in original).

For these reasons, the court cannot summarily decide the realistic-expectations element of the exemption test. That issue too must await the trier of fact.

\*   \*   \*

The court consequently denies Equinox's motion for summary judgment against Claims 1-6.

## II. THE DERIVATIVE UCL CLAIM

The preceding analysis equally dictates that the court deny Equinox's motion with respect to Claim 7, under California's UCL.

The UCL claim is wholly derivative of the misclassification claims. As Judge Chen recently explained:

> The UCL substantively prohibits business acts or practices that are "unlawful." *See* Cal. Bus. and Prof. Code § 17200. As the California Supreme Court has explained, "section 17200 'borrows' violations of other laws and treats them as unlawful practices independently actionable" under the UCL. *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 839, 33 Cal. Rptr. 2d 438 (1994) (quoting *Farmers Ins. Exchange v. Superior Court*, 2 Cal.4th 377, 383, 6 Cal. Rptr. 2d 487, 826 P.2d 730 (1992)). Thus, as one leading treatise author has noted, "if a 'business practice' violates any law — literally — it also violates § 17200 and may be redressed under that section." William L. Stern, *Business and Professions Code § 17200 Practice*, 3:56 (Rutter Group 2014 ed.) (quoting Cal. Bus. and Prof. Code § 17200).

*Newton v. Am. Debt Servs., Inc.*, 2014 WL 7183930, at *5 (N.D. Cal. Dec. 16, 2014). Equinox has not identified a reason for dismissing the UCL claim that is somehow independent of the fate of the misclassification claims. Because summary judgment is not warranted on the underlying misclassification claims, it must also be denied on the UCL claim. *Cf., e.g., Glenn K. Jackson, Inc. v. Roe*, 273 F.3d 1192, 1203 (9th Cir. 2001) (affirming summary judgment against UCL claim where underlying claims had substantively failed).

## III. WHISTLEBLOWER RETALIATION — WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

### A. General Analysis

Mr. Smith alleges that he was wrongfully terminated in retaliation for complaining internally that he and other Equinox employees were misclassified as exempt, and about Equinox's alleged failure to provide meal and rest breaks, and that this retaliatory discharge violated California public policy, particularly as reflected in California Labor Code Section 1102.5. (Compl. – ECF No. 1-1 at 6, ¶ 7.) He specifically names 1102.5(b) and (c) in his wrongful-termination claim (id. at 20, ¶¶ 82-83), and the latter section (along with other code sections) are said to constitute California "fundamental public policy." (Id. at 20-22, ¶¶ 81-94.)

United States District Court
Northern District of California

United States District Court
Northern District of California

The California Court of Appeal has explained the framework that governs such claims:

> When a plaintiff alleges . . . wrongful employment termination in violation of public policy, and the defendant seeks summary judgment, California follows the burden shifting analysis of *McDonnell Douglas Corp. v. Green*[, 411 U.S. 792 (1973)] to determine whether there are triable issues of fact for resolution by a jury.

*Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1108-09 (2007). The familiar *McDonnell-Douglas* approach runs as follows:

> In the first stage, the "plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042, 32 Cal. Rptr. 3d 436, 116 P.3d 1123.) If the employee successfully establishes these elements and thereby shows a *prima facie* case exists, the burden shifts to the employer to provide evidence that there was a legitimate, nonretaliatory reason for the adverse employment action. (*Morgan v. Regents of University of California* (2000) 88 Cal. App. 4th 52, 68, 105 Cal. Rptr. 2d 652.) If the employer produces evidence showing a legitimate reason for the adverse employment action, "the presumption of retaliation ' " ' drops out of the picture,' " ' " (*Yanowitz, supra*), and the burden shifts back to the employee to provide "substantial responsive evidence" that the employer's proffered reasons were untrue or pretextual. (*Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal. App. 4th 1718, 1735, 35 Cal. Rptr. 2d 181.)

*Loggins*, 151 Cal. App. 4th at 1109.

There is no doubt that Mr. Smith engaged in "protected activity": he complained that Equinox was not observing its policy on mandatory meal and rest breaks; and he suggested that Equinox might have misclassified him as an exempt employee. There is obviously no doubt that Mr. Smith was later fired. Equinox has moreover articulated, and provided evidence to support, a "legitimate, nonretaliatory reason" for firing Mr. Smith: the company contends that it fired Mr. Smith "for ringing his own sales, [and] giving improper discounts." (*See, e.g.,* ECF No. 49-1, ¶¶ 56, 61.) (More exactly, Equinox contends, and its proof suggests, that Mr. Smith "gave himself a discount on items that he should never have discounted (specifically[,] black Lululemon gear)." (*Id.* ¶ 56.)) It is undisputed that Equinox had recently fired an employee in New York "for abusing the employee discount and ringing her own sales." (ECF No. 49-1, ¶ 57.)

The retaliation inquiry thus comes down to whether Mr. Smith has raised a material issue of fact that Equinox's stated explanation was pretextual. Having parsed the parties' proof and arguments, the court concludes that there is at least some evidence that Equinox's  stated reasons may have been pretextual. For example, in firing Mr. Smith, Equinox pointed to three transactions in which he rang his own sales. Equinox's own witness (Becca Briggs) testified, however, that Equinox's corporate offices instructed Mr. Smith to conduct the first of these transactions as a rough-and-ready way to correct an inventory-tracking error associated with a consignment sale. (Briggs Dep. – ECF No. 51-3 at 14-22.) Mr. Smith has testified that the second transaction "reflects the same type of cash[-]register activity," which raises the plausible (if not "inescapable") conclusion that "this was also an inventory correction." (*See* ECF No. 51 at 28.)

The court has trod as alertly as possible through the brush of facts constituting the proof and arguments on pretext. It has tried to do so with a clear understanding that it is often easy to "muddy the waters" to deflect an otherwise proper summary judgment. The court concludes that a trier of fact must be allowed to pass on the issue of pretext; the evidence does not permit the court to decide the question on summary judgment.

### B.  Disclosure of Known Information

Equinox argues that Mr. Smith cannot establish a *prima facie* wrongful-termination claim — or, perhaps more precisely, whistleblower-retaliation claim — in part because, in complaining about the inability of Equinox employees to take their compulsory breaks, he was "disclosing" information that was already known. It is undisputed that, when Mr. Smith made his complaint, Equinox was already the defendant in a wage-and-hour case; it is also undisputed that Mr. Smith knew this. (ECF No. 49-1, ¶¶ 39-40.) The whistle, says Equinox, had already been blown. And calling attention to public information cannot constitute a "disclosure" under California Labor Code § 1102.5 — the statute that provides the "policy" anchor for Mr. Smith's claim of wrongful termination in violation of public policy.

The court is not convinced that Mr. Smith's complaints do not constitute "disclosure" under § 1102.5. What Mr. Smith complained of was not merely the basic fact that Equinox had problems

with employees missing their requisite breaks — which is what knowledge of the pending lawsuit would have generally provided. Rather, and somewhat more precisely, Mr. Smith was telling Equinox that there were persisting problems in this area in the shops that he managed. That is at least notionally different from the fact that Equinox had previously had problems with break compliance. And, as Equinox recognizes, "[Section] 1102.5 does not only apply to 'first reporters.'" (ECF No. 49 at 25 n. 9 (citing *Hager v. County of Los Angeles*, 228 Cal. App. 4th 1538 (2009)). To his complaint about breaks, moreover, Mr. Smith added his suggestion that he himself might be misclassified under the labor laws.

In any event, the court need not decide whether Mr. Smith's mandatory-break complaint was a "disclosure" under § 1102.5. Mr. Smith's wrongful-termination (or whistleblower-retaliation) claim is not a claim directly under § 1102.5; instead, § 1102.5 supplies the "policy" backing for his claim for "wrongful termination in violation of public policy." This is a distinction that precedent recognizes and upholds. A plaintiff can invoke § 1102.5 to support a claim for termination in violation of public policy without bringing a § 1102.5 claim, properly so called, and thus without having to establish the *prima facie* elements of a true § 1102.5 claim. *See, e.g., Banko v. Apple, Inc.*, 2013 WL 6623913 at *3-4 (N.D. Cal. Dec. 16, 2013). This has various doctrinal consequences, the most relevant being that a termination-in-violation-of-public-policy claim does not fail just because the facts of a case would not support a *prima facie* claim directly under § 1102.5. The present ramification being that, even if Mr. Smith's mandatory-break grievance was not a "disclosure" under § 1102.5, it can yet constitute the "protected activity" that launches the plaintiff's retaliation claim under the *Loggins–McDonnell-Douglas* analysis. If Mr. Smith complained about what was already known, in other words, that does not summarily defeat his retaliation claim. *See Banko*, 2013 WL 6623913 at *3-4 (denying motion to dismiss termination claim where plaintiff was not "whistleblower" under relevant statutes); *Weingand v. Harland Fin. Solutions, Inc.*, 2012 WL 3537035 (N.D. Cal.) (denying motion to dismiss termination claim even while dismissing direct § 1102.5 claim); *Stoval. v. Bain Street Props.*, 2013 WL 6002758 (N.D. Cal.) (denying summary judgment against termination claim even though plaintiff was likely

precluded from bringing a direct § 1102.5 claim).

## IV. DEFAMATION

The plaintiff's claim for defamation likewise cannot be dismissed on summary judgment. Mr. Smith claims that two other Equinox store managers told him that "they heard he was terminated for 'integrity reasons.'" (ECF No. 49-1, ¶ 64.) One of these managers further told him that she had been told this by regional manager Brooke English. (*Id.* ¶ 65.) Mr. Smith does not know of anything suggesting that information about his firing had been otherwise "made public." (*Id.* ¶ 67.)

The court is aware of the law that requires allegations of defamation to describe the challenged statements with heightened particularity. *See, e.g., Jones v. ThyssenKrupp Elevator Corp.*, 2006 U.S. Dist. LEXIS 13978 (N.D. Cal. 2006). In this case, however, in the context of Mr. Smith's having been fired, the statement that he was terminated for "integrity reasons" is specific enough to be defamatory. Or, more precisely, it is specific enough that a jury should be allowed to pass on whether it was defamatory.

This brings us to the question of privilege. Equinox argues that the statement by Ms. English cannot be actionably defamatory because it comes under the qualified privilege set out in Cal. Civ. Code § 47(c). (ECF No. 49 at 28-29.) Because the challenged communication was made between Equinox managers, and concerned a matter in which they had a common interest, the privilege nearly applies as a matter of law. It is a statutory requisite of the privilege, however, that the putatively protected communication be made "without malice." Cal. Civ. Code § 47(c). Here, Mr. Smith points to two things that he argues raise a triable question on malice. First, he asserts that he and Ms. English shared a "history of hostility." (ECF No. 49 at 32.) Second, he claims that another Equinox officer "told [Smith] during his termination meeting that if he did not sign a severance agreement, Equinox would make it public that he had stolen from the company." (ECF No. 51 at 32; Smith Dep. – ECF No. 51-2 at 55.) This is not overwhelming proof that Ms. English's statement was made maliciously, but it is enough to overcome the defendant's motion for summary judgment.

ORDER 14-846 LB

United States District Court
Northern District of California

## V.  BREACH OF CONTRACT

The plaintiff's final claim is for breach of contract. (ECF No. 1-1 at 23, ¶¶ 99-101.) Neither party has given the court a very detailed analysis on the plaintiff's contract claim. The contract in question consists of a 2008 offer letter from Equinox to Mr. Smith to which was appended a "Compensation Plan." The latter set out a defined plan for monthly bonuses if Mr. Smith's shops met certain sales goals, stated in specific dollar figures. (*See* ECF No. 51-6 at 2-5.)

The parties agree that Equinox changed the monthly sales goals as it set successive annual budgets. Mr. Smith does not appear to be complaining about that. His grievance, his claim of breach, is that sometime in 2013 Equinox raised his sales goals *beyond* those called for in the annual budget. (*See* Smith Dep. – ECF No. 141-48; Compl. – ECF No. 1-1 at 23, ¶ 100 ("Plaintiff was required to meet higher sales goals than [had been] set annually for his stores")).) That Equinox did this is undisputed. (ECF No. 49-1, ¶¶ 35-37.) Mr. Smith complains that this effectively — and wrongfully — "reduced" or "denied" his bonus compensation. (ECF No.1-1 at 23, ¶ 100.)

The undisputed facts do not raise a triable claim for breach of contract. Equinox correctly argues that nothing in the offer letter prevents the company from raising its monthly sales targets in this manner. (*See* ECF No. 51-6, *passim*.) To the contrary, the letter expressly says: "Given the at-will nature [of the employment agreement,] the Company may from time-to-time [*sic*] add to, *modify*, or discontinue its *compensation policies . . .* or *other aspects of your employment*." (*Id.* at 3 (emphases added).) This express grant of authority scotches Mr. Smith's contract claim. The court would additionally note: The contract claim alleges that Equinox breached the employment contract in "bad faith." The court has seen absolutely no evidence that Equinox raised Mr. Smith's sales targets out of malice or anything else that could be deemed "bad faith." The undisputed facts establish, to the contrary, that Equinox raised his targets because he was doing a "fabulous" job, and the company believed he could achieve the more ambitious goals. (ECF No. 49-1, ¶ 37.)

1

## CONCLUSION

2     The court denies Equinox's motion for summary judgment on the First through Eighth Causes

3  of Action. The court grants summary judgment in favor of Equinox on the Ninth Cause of Action

4  for breach of contract; that claim is dismissed with prejudice.

5     This disposes of ECF No. 49.

6     **IT IS SO ORDERED.**

7  Dated: April 10, 2015

8  _____

9  LAUREL BEELER
   United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California